UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| V. | * | Cr. No. GLR-21-054 |
| MEDARD ULYSSE | * | |
| **Defendant** | * | |
| * | | |
| For: MEDARD ULYSSE | * | |

## MOTION FOR RECONSIDERATION OF DETENTION RULING AND REQUEST FOR IN PERSON HEARING

Defendant, Medard Ulysse, by his undersigned counsel, hereby files this motion for reconsideration of his detention ruling and requests a hearing on this motion and states:

On March 4, 2021, Mr. Ulysse and two co-defendants were charged with conspiracy to commit mail fraud. On March 24, 2021, Mr. Ulysse's home in Georgia was searched in his absence and he became aware of an arrest warrant for him in Maryland. Defendant consulted with his southern counsel who advised him to turn himself in. In the morning of March 26, 2021, he did just that at the federal courthouse in Baltimore and had his initial appearance later that day. The Government sought detention and a hearing was set for March 29, 2021. At that time, however, the defense had not yet arranged for a third party custodian and the hearing was continued to March 31, 2021.

At the end of this second hearing, the defendant was detained by then Magistrate Judge Deborah Boardman. A copy of the transcript of that hearing is attached hereto as Exhibit A. This motion seeks reconsideration of the detention ruling based on new information concerning the law applicable to this case and

corrected information relating to his detention that was not available to defense counsel at the time of the hearing.[1]

The grounds for reconsideration and reversal of the detention ruling are several.  First, the Government was not entitled to a detention hearing and the legal argument presented to the Court on this issue was legally incorrect.  By the plain terms of the Bail Reform Act, 18 U.S.C. sec. 3142 ("the Act"), a detention hearing should never have been held and the defendant could not be detained;.  Second, even if the Government were entitled to a detention hearing under the Act, the only issue properly before the Court was whether Mr. Ulysse was a "serious risk" of flight.  Third, the factual proffers made by the Government at the hearing were incomplete and turn out to be unproven in the discovery provided to date.  Finally, the full description of Mr. Ulysse's arrest history establishes that he is not a danger to the community.

I. <u>The Government Was Not Entitled to a Detention Hearing</u>

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,*  481 U.S. 739, 755

---

[1]  Each of the above-referenced hearings was held by video with Mr. Ulysse either in the Marshals lockup or at the Chesapeake Detention Facility (CDF).  At that time, due to COVID restrictions on client access,  the wait for a video meeting with a client at CDF was over two weeks.  Counsel was permitted about ten minutes before the initial appearance and the detention hearings to speak in private with Mr. Ulysse, which did not permit sufficient time to gather all of the relevant information.  In addition, because counsel and the defendant were not in court together, Mr. Ulysse could not inform counsel of new information as the hearing progressed and thus the new information contained herein could not be provided contemporaneously with the Government's presentation.   And, because much of the Government's presentation related to what was to be provided in discovery, counsel thought it wise to wait for and review that discovery before re-engaging the Court on the issue of detention.  That discovery was requested in mid-May of this year and, although some discovery has been provided, the needed discovery to assess the majority of the Government's detention argument has yet to be provided.

(1987).  To protect this norm, the "Act carefully limits the circumstances under which detention may be sought to the most serious of crimes. See 18 U. S. C. § 3142(f)." *Id.*, at 747.[2]  And so, "[t]o ensure that pretrial detention would continue to be an exception, Congress limited the categories of cases eligible for pretrial detention to those listed in 18 U.S.C. § 3142(f). *See United States v. Twine,* 344 F.3d 987, 987 (9th Cir. 2003); *United States v. LaLonde,* 246 F. Supp. 2d 873, 875 (S.D. Ohio 2003) (quoting S. Rep. No. 98-225, at 20 (1984)) ("[T]he requisite circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial.")  As a result, "a motion seeking such detention is permitted only when the charge is for certain enumerated crimes, 18 U.S.C. § 3142(f)(1) (crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or felonies committed by certain repeat offenders), or when there is a serious risk that the defendant will flee, or obstruct or attempt to obstruct justice. *Id.* § 3142(f)(2)." *United States v. Friedman* 837 F.2d 48, 49 (2nd Cir. 1988).

The restrictive limitations contained in the Act, at subsection (f)(1), provide:

> (f) Detention Hearing.—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community—
> (1) upon motion of the attorney for the Government, in a case that involves—
> (A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

---

[2]  *Salerno* also found that "the pretrial detention contemplated by the Bail Reform Act is regulatory in nature, and does not constitute punishment before trial in violation of the Due Process Clause." *Id.*, at 748.  Given the horrible conditions at the Chesapeake Detention Facility, which was never designed for long term incarceration, the Court's assessment may well be quite different today.

    (B) an offense for which the maximum sentence is life imprisonment or death;
    (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;
    (D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses;

For matters that fall outside of subsection (f)(1), subsection (f)(2) grants two specific other instances where detention can even be held:

  (2) upon motion of the attorney for the Government or upon the judicial officer's own motion in a case, that involves—(A) a serious risk that such person will flee; or (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

  Neither subsection applies to Mr. Ulysse's case.

  A. <u>Requisites for a Detention Hearing</u>

  Because "[a] hearing can be held only if one of the six circumstances listed in (f)(1) and (2) is present; detention can be ordered only after a hearing is held pursuant to § 3142(f). Detention can be ordered, therefore, only 'in a case that involves' one of the six circumstances listed in (f),…" *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992. *Accord*, *United States v. Ploof*, 851 F.2d 7, 9 (1st Cir. 1988) and *United States v. Himler*, 797 F.2d 156, 160 (3rd Cir. 1986). To summarize, Section "3142(f) allows a federal court to conduct a detention hearing *only if* one of the six conditions set forth in subsections (f)(1)(A) through (f)(2)(B) is met." *Tadlock*, 399 F.Supp.2d 747, 750 (S.D. Mi 2005) (emphasis in original).

Therefore, a "request to detain a defendant pending trial triggers a two-step inquiry." *United States v. Delgado*, 985 F.Supp. 2d 895, 897 (N.D. Ia. 2013), citing *Friedman*, *id*. A court "must first determine by a preponderance of evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." *Id*. "As a threshold matter, the Government must show by a preponderance of the evidence that the case involves an offense listed in 18 U.S.C. § 3142(f)(1), or that the defendant presents certain risk factors, as identified in § 3142(f)(2)." *Id*. Failure to meet this preliminary threshold eliminates the statutory authority to hold a detention hearing. And because a defendant cannot be detained absent a detention hearing. 18 U.S.C. sec. 3142 (e) and (f), without the authority to hold such a hearing, a defendant must be released.

As the plain language of the Act sets forth, "[p]retrial detention is not authorized unless at least one of seven enumerated circumstances is applicable. 18 U.S.C. § 3142(f). The first five circumstances refer to "offense types," such as crimes of violence, offenses punishable by life imprisonment, serious drug offenses, felonies committed by repeat offenders, and felonies involving minor victims or guns. 18 U.S.C. § 3142(f)(1)(A-E). The last two circumstances involve "risk factors," such as a serious risk of flight, or a serious risk the defendant will obstruct justice. 18 U.S.C. § 3142(f)(2)(A, B)." *Delgado, id.* Here, despite the erroneous legal claim made by the Government at the hearing before Judge Boardman, neither subsection (f)(1) nor (f)(2) apply here.

B. <u>Subsection (f)(1) Does Not Apply Here</u>

The parties agree that Mr. Ulysse is not charged with any of the offenses listed in (f)(1)(A) through (C) and the Government does not suggest otherwise. And, although defendant concedes that his "kidnapping" conviction qualifies as a crime of violence under (f)(1)(D), the Act requires two such offenses under that subsection, so that subsection does not apply absent a second qualifying conviction.

The only subsection even potentially relevant here is another part of (f)(1)(D): "two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed", specifically whether any one of Mr. Ulysse's prior marijuana distribution convictions, if brought in federal court, would have been an "offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act."

The Government's argument on this question was concise but legally flawed. The Government stated "any sort of recidivist drug trafficking offense can carry a sentence of up to 10 years in imprisonment, and I believe that is regardless of quantity." Exh. A at p. 10. While this statement might have been accurate prior to the passing of the First Step Act in 2018, the statement is now incorrect.

Under prior law, a defendant who was convicted under any subsection of 21 U.S.C. sec. 841(b)(1)(A) was subject to enhanced penalties if that defendant committed such offense "after a prior conviction for a felony drug offense has become final." A "felony drug offense" was defined as an "offense that is punishable by imprisonment for more than one year under any law of the United States or of a State"

for a narcotic offense. 21 U.S.C. sec. 802(44). The First Step Act made two significant changes to the 841(b)(1)(A) enhancement. The First Step Act struck the provision requiring a "felony drug offense" and now requires a "serious drug felony" as an 851 predicate. The Act then defined "serious drug felony": section 401(a)(1), in pertinent part, defines a "serious drug felony" as a narcotics offense "for which (A) the offender served a term of imprisonment of more than 12 months…" 21 U.S.C. sec. 802(57). Thus, unless a defendant served more than 12 months in jail, regardless of the actual sentence, the 851 enhancement cannot apply.

Mr. Ulysse has three prior convictions for distribution of marijuana - in North Carolina in 2007 and in Florida in 2011 and 2012. Per the pretrial report, he received a sentence of 6 to 8 months for the 2007 offense and concurrent terms of seven months and 27 days for the two Florida charges. Thus, none of his convictions would qualify as a "serious drug felony" under current law and therefore, Ulysse would not be subject to the 851 enhancement for any of them.[3] As a result, 18 U.S.C. sec 3142(f)(1)(D) does not apply here and, therefore, none of the subsections of (f)(1) apply to permit a detention hearing for Mr. Ulysse. The Court would then be required to turn to subsection (f)(2).

---

[3] This particular argument was not presented to Judge Boardman, although the First Step Act had been passed years earlier. Counsel was focused on a different argument explaining why a detention hearing was not permitted under the Act. The 851 enhancement argument was presented for the first time at the hearing and defense counsel did not automatically connect the flaws in that argument to the new law. Because this portion of the instant motion presents new legal argument, this motion could be interpreted as an appeal of the detention ruling. However, the instant motion also presents new factual information that has a material bearing on the detention issue and, therefore, is presented *ab initio* as a request for reconsideration.

### C. The Government Cannot Meet the Preponderance of Evidence Standard on Serious Risk of Flight Under (f)(2)

Subsection (f)(2) permits the Government to seek detention under two conditions: that it can show by a preponderance of evidence that the the defendant is a "serious" risk of flight or a "serious" risk that he will obstruct justice. Obviously, when a defendant who turns himself, particularly from out of state, establishing that he would then flee is a significant uphill challenge for the Government.

With regard to the obstruction subsection, at the hearing, the Government conceded that it had no information that in the two days between when Ulysse was advised to self-surrender and his arrival at the federal courthouse in Baltimore two days later, that the defendant had attempted to destroy evidence: "And the Government, at this time, doesn't have any evidence but it has real concerns that he spent that time destroying evidence, or arranging contacts with potential witnesses." Exh. A, at p. 23. Similarly, the Government had no evidence that Mr. Ulysse had sought to influence anyone in this or the related case. The Court asked "THE COURT: And do you have any evidence that Mr. Ulysse has contacted them, or their relatives, and threatened them since they have been charged with anything?" and Government counsel responded "No, but I will have to note that only a week has passed the Defendant became aware of this case. So -- " *Id*., at 25.[4]

The final question is whether the Government could meet its burden of showing that there was a "serious risk" that Mr. Ulysse would flee under 18 U.S.C. sec. 3142(f)(2)(B). The statute requires more that suspicion of flight or even evidence

---

4      The Government also proffered the statements of arrested co-defendant cooperators that Mr. Ulysse had threatened them. No factual corroboration of these allegations was presented at the hearing.

that a defendant would in fact flee. Rather, (f)(2)(B) requires a Court to find, by a preponderance of evidence, that the defendant is more than just a risk of flight, but a "serious" risk of flight. Against the backdrop of a defendant who turned himself in, this is a high burden indeed., which the Government did not meet.

Judge Boardman found that there were conditions that could be placed to reasonably assure Mr. Ulysse's appearance in court, a finding that directly defeats any suggestion that the Government could have met the higher "serious" risk of flight standard. The Court stated that after considering the full presentation by the Government , there was "enough to convince me that I could set conditions that would reasonably assure your appearance." Exh. A, at p. 52. If those conditions exist (which included 24 hour lockdown at home with his son), then Mr. Ulysse cannot be a "serious" risk to flee.

Therefore, none of the subsections of 3142(f) apply to permit a detention hearing and, without a hearing, the defendant cannot be detained and Mr. Ulysse should be released.

II. Information Not Presented at the Hearing That Has a Material Bearing on the Issue of Detention

Because the Bail Reform Act does not permit a detention hearing in this case, any further arguments regarding detention are not relevant. Further, even if a hearing were permitted, it could only occur under subsection (f)(2)(A) on the issue of flight. "However, the Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated above [in 18 U.S.C. sec. 3142(f)(1)]." *Friedman*, at 49.

Nevertheless, to the extent that the Court is seeking new information to permit a reopening of the hearing, the defense provides the following information that was material to Judge Boardman's decision but not available to defense counsel at the time of the hearing.

The crux of the Government's presentation was the claim that Mr. Ulysse is far too dangerous an individual to be released to society, even on 24 hour lockdown. Several of the claims made by the Government relied on unproven allegations of assaults on codefendants. Beyond those claims, which were challenged by the defense at the hearing, the Government suggested that Mr. Ulysse had a "pattern of domestic disturbance." Exh. A, at p. 35. This "pattern" was based on a police report that stated that at some point, Mr. Ulysse got angry his son's mother, Alexis Woodward, and threw her and her luggage out of the car abandoning her by the side of the road. Following the hearing, Ms. Woodward explained to defense counsel that she was never abandoned by the side of the road but instead was dropped off at a five star hotel with her luggage. Ms. Woodward advised counsel after the hearing that she was on the public access line and it was frustrating not to have a way to correct this misinformation.

There was, in fact, no "pattern of domestic disturbance" but the facts to counter that argument could not be presented at the hearing. Indeed, Ms. Woodward was well aware of her relationship with the defendant and was willing to have him live with her 24 hours a day. No potential for danger actually existed between Mr. Ulysse and Ms. Woodward.

In addition, after learning that the defense intended to present Ms. Woodward as his proposed third party custodian, the Government sent two FBI agents to the

woman's home, a fact defense counsel did not learn of until after the hearing. The agents intimidated the woman and then appear to have told the Government that she made statements that she has later denied saying. Those inaccurate statements were important to the Government's argument because they were intended to defeat any defense argument about the positive relationship between Mr. Ulysse and his son.[5]

Following the hearing, Ms. Woodward contacted undersigned counsel to advise that the representations of the Government (*inter alia*, that he had not seen his son in five years) were inaccurate and that Mr. Ulysse had in fact been to Maryland to see his son recently. Again, due to the separate video nature of the hearing, Mr. Woodward could not be in court to provide this information at the hearing.

Another critical part of the Government's argument centered on the arrest of Mr. Ulysse in November, 2020, during which three binders of personal identifying information of others, $34,000 in cash were found in the vehicle and "Some of the debit cards are believed to be associated with unemployment insurance benefits issued in other persons' name." Exh. A, at p. 22. The Government argued that these seizures suggested that Mr. Ulysse was unduly dangerous because he was involved in another fraud and had ongoing access to the personal information of others. Exh. A, *id*.

What was not presented to the Court, and unknown to defense counsel, was that there was a passenger in the car who could easily have been the owner of the items seized. What was also unknown by the defense at the time of the hearing was that the passenger was Amaya English, a co-defendant in the instant fraud case. Thus,

---

[5] Mr. Ulysse's son is eight years old. When he was five years old, he was diagnosed with adrenoleukodystrophy, which is a genetic condition -- a very rare condition, that destroys the myelin sheath around the nerve cells in the brain, and precludes -- and prevents the brain from sending out messages to the rest of the body. He is fighting for his life. He cannot eat, he cannot drink, he cannot speak, and he barely breathes on his own.

it was equally likely that the "unemployment documents" belonged to Ms. English, a possibility not presented to Judge Boardman. It is also worth noting that, although no two defendants' situations are the same, the argument that someone in the car with the binders of personal information of other would be danger to society applies equally to Ms. English. She, however, was released. ECF 24.[6]

## CONCLUSION

Under the plain terms of the Bail Reform Act, the Government was not entitled to a detention hearing under 18 U.S.C. sec. 3142(f)(1). To the extent that a hearing was permitted under subsection (f)(2), that hearing was only permitted to address risk of flight and the Judge found that conditions of release could be drafted to reasonably assure the defendant's appearance in court. Under these circumstances, Mr. Ulysse's continued detention is illegal and he must be released on conditions.

Respectfully submitted,

_____/s/_____
Richard Bardos, Of Counsel
Schulman, Hershfield & Gilden, P.A.
1 East Pratt Street, 9th Floor
Baltimore, Maryland 21202
(410) 332 0850

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 19th of July, 2021, a copy of the foregoing motion was served electronically by ECF to: Office of the United States Attorney, 36 South Charles Street, Fourth Floor, Baltimore, Maryland 21201 and all defense counsel.

---

[6] Indeed all defendants in this case and the related case, CCB-19-567, have been released except Mr. Ulysse, ECF 9, 29. Those released include two co-conspirators, Green and Charlemagne, who have plead guilty. *See* CCB-19-567, ECF 44 (Green plea agreement); Charlamagne's plea agreement is not on PACER but PACER lists a guilty plea on October 29, 2020.

_____/s/_____
Richard Bardos