

FILED ___ ENTERED
___ LOGGED ___ RECEIVED

**U.S. Department of Justice** 5:47 pm, Sep 23 2022

*United States Attorney*
*District of Maryland*
*Northern Division*

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

---

| | | | |
|---|---|---|---|
| *Sean R. Delaney*<br>*Assistant United States Attorney*<br>*Sean.Delaney@usdoj.gov* | *Mailing Address:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *Office Location:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *DIRECT: 410-209-4913*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091* |

July 22, 2022

Richard B. Bardos
Schulman, Hershfield and Gidlen PA
1 E Pratt St., Ste 904
Baltimore, MD 21202
410-332-0850

Re:   <u>United States v. Medard Ulysse</u>
        Criminal No. RDB-21-54

Dear Counsel:   RDB-22-0335

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Medard Ulysse (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. **If this offer has not been accepted by August 1, 2022 at 5:00 pm, it will be deemed withdrawn.** The terms of the Agreement are as follows:

### Offense(s) of Conviction

1.     The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349.

2.     The Defendant also agrees to plead guilty to a separate information charging him with Wire Fraud, in violation of 18 U.S.C § 1343. The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

### Elements of the Offense(s)

3.     The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland:

Elements of Conspiracy to Commit Mail Fraud:

     a.   The Defendant and at least one other person entered into an unlawful agreement;

b.  The purpose of the agreement was to knowingly execute or attempt to execute a scheme and artifice to defraud or to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and to use or cause the use of the mails (or a private or commercial carrier or interstate wires) as charged in the Indictment; and

c.  The Defendant knowingly and willfully became a member of the conspiracy.

Elements of Wire Fraud

a.  There was a scheme and artifice to defraud or to obtain money by means of materially false and fraudulent pretenses, representations, and promises, as charged in the Information;

b.  that the Defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with the specific intent to defraud; and

c.  that for the purpose of executing the scheme, the Defendant caused the use of interstate wires, as specified in the Information.

<u>Penalties</u>

4.      The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C. § 1349 | N/A | 20 years | 3 years | $250,000 or twice gross gain/loss | $100 |
| 2 | 18 U.S.C. § 1343 | N/A | 20 years | 3 years | $250,000 or twice gross gain/loss | $100 |

a.      Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

Rev. August 2018

2

c.      Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

5.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily.  All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.  The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt.  The Defendant would have the right to confront and cross-examine the Government's witnesses.  The Defendant would not have to

Rev. August 2018

3

present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

        d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

        e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<div align="center">Advisory Sentencing Guidelines Apply</div>

        6.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and

Rev. August 2018

28 U.S.C. §§ 991 through 998.  The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<div align="center">Factual and Advisory Guidelines Stipulation</div>

7.    This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.  This Office and the Defendant further agree that:

**Conspiracy to Commit Mail Fraud:**

a.    The applicable base offense level is 7, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

b.    The offense level is increased an additional 16 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss in this case was between $1,500,000 and $3,500,000;

c.    The offense level is increased an additional 4 levels pursuant to U.S.S.G. § 2B1.1(b)(2)(B), because the offense resulted in a substantial financial hardship to 5 or more victims;

d.    The parties do not agree as to whether the offense level is increased an additional 2, 3, or 4 levels pursuant to U.S.S.G. § 3B1.1(c), based on the defendant's role in the offense.

e.    This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty.  This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

**f.    Accordingly, the resulting anticipated offense level for conspiracy to commit mail fraud, after reduction for acceptance of responsibility, is 26, 27, or 28.**

**Wire Fraud**

     a.     The applicable base offense level is 7, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

     b.     The offense level is increased an additional 14 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss in this case was between $550,000 and $1,500,000;

     c.     The offense level is increased an additional 2 levels pursuant to U.S.S.G. § 2B1.1(b)(2)(A((i), because the offense involved 10 or more victims;

     d.     This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

     **e.     Accordingly, the resulting anticipated offense level for wire fraud is 20.**

     8.     The parties agree that the two categories of offenses do not involve substantially the same harm under U.S.S.G. § 3D1.2, and therefore they do not group together. Pursuant to U.S.S.G. § 3D1.4, the offense level for conspiracy to commit mail fraud has the highest anticipated offense level and is increased by one level by the charge of wire fraud.

     **Accordingly, the total anticipated adjust offense level is either 27, 28, or 29.**

     9.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

     10.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

<u>Rule 11(c)(1)(C)</u>

11.     The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence between 48 months and the low end of the resulting United States Sentencing Guidelines range is the appropriate disposition of this case.  The parties also stipulate and agree that the defendant shall pay restitution as set out in Paragraph 13 herein, and that a fine is not appropriate in this case.  In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void.  Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

<u>Waiver of Appeal</u>

12.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

        a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever.  This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

        b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum.

        c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<u>Restitution</u>

13.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties stipulate does not exceed $2,730,520 as to the conspiracy to commit mail fraud charge, and $618,767 as to the wire fraud charge.  The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation.  The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution.  Regardless of

Rev. August 2018

Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

14.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

15.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including a money judgment in the amount of proceeds the Defendant obtained from the Defendant's illegal activities.

16.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

17.     The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

18.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Rev. August 2018

## Abandonment

19.     The Defendant knowingly and voluntarily waives any and all of the Defendant's right, title, and interest in the following items seized by law enforcement on August 5, 2020, and February 3, 2021, (the "Abandoned Property") and consents to its federal administrative disposition, official use, and/or destruction:

      a.   Taurus PT140G2A SMAO9833 (1B87)
      b.   One Magazine with approximately ten .40 Caliber Rounds (1B112)
      c.   HD Video Recorder Disk, Micro SD Thumb Drive (1B110)
      d.   Black Samsung Phone, Serial Number: R9HNCD8GKBJ (1B92)
      e.   HP Laptop, Serial Number: 5CD0288XXK (1B85)
      f.   White LG Cell Phone (1B84)

20.     The Defendant understands that he would have a right to file a claim to the Abandoned Property. The Defendant agrees not to contest the vesting of title of the Abandoned Property in the United States Government and agrees to unconditionally release and hold harmless the United States Government, its officers, employees, and agents, from any and all claims, demands, damages, causes of actions, suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the seizure or waiver of ownership interest in the Abandoned Property.   The Defendant agrees to execute any documents as necessary to the waiver of right, title and interest in the Abandoned Property, including any forms necessary to effect the Defendant's waiver of ownership interest.

## Defendant's Conduct Prior to Sentencing and Breach

21.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

22.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule

11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.  In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

23.     The Court is not a party to this Agreement.  The sentence to be imposed is within the sole discretion of the Court.  The Court is not bound by the Sentencing Guidelines stipulation in this Agreement.  The Court will determine the facts relevant to sentencing.  The Court is not required to accept any recommendation or stipulation of the parties.  The Court has the power to impose a sentence up to the maximum penalty allowed by law.  If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement.  Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive.  The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

24.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case.  This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant.  There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement.  No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Sean R. Delaney
Christine Goo
Zachary Ray
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

08/30/22
Date

Medard Ulyeso

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

9/21/22
Date

Richard B. Bardos, Esq.

Rev August 2018

**ATTACHMENT A**

**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Elder Fraud Scheme

Defendant MEDARD ULYSSE ("ULYSSE") was a resident of Miami, Florida and Covington, Georgia. From at least in or about January 2018 through at least in or about November 2019, in the District of Maryland and elsewhere, ULYSSE conspired with others known and unknown to commit mail fraud. Specifically, ULYSSE's co-conspirators persuaded elderly victims to send thousands of dollars in cash through the United States Postal Service and by private and commercial interstate carriers to members of the conspiracy under false pretenses that:

a.   the money would be used to help the victims' relatives pay legal or other expenses in connection with crimes and other incidents that had not occurred, and

b.   the money would be sent to particular individuals at their addresses, rather than to members of the conspiracy falsely claiming to reside at those addressees

(collectively the "scheme to defraud").

ULYSSE's co-conspirators telephoned elderly victims throughout the United States and, while posing as a police officer, lawyer, or other individual, falsely told the victim that a relative, typically the victim's grandchild, had been incarcerated in connection with a car accident or traffic stop involving a crime, and needed money for bail and legal fees, often tens of thousands of dollars. The co-conspirators also posed as the victims' relatives themselves in order to further induce the victims to send the cash. The co-conspirators described the situation as extremely serious, sometimes indicating that illegal drugs had been found in the vehicle, or that the occupant of another car was injured. In order to conceal the crime, the co-conspirators told the victims false information, like that there had been a "gag order" placed on the case requiring secrecy, or that the situation was embarrassing for the grandchild, and that the victim should not share the information with others.

During the telephone calls, the co-conspirators directed the victims to send cash to a particular address via overnight delivery service, such as United States Postal Service Priority Mail, Fed Ex, and United Parcel Service. If the victims sent cash as directed by the co-conspirators, the co-conspirators would call the victims again and ask for more cash, claiming that additional funds were necessary for various purposes, such as their grandchild's legal expenses, bail costs, or fines, or to pay damages. The co-conspirators obtained tens of thousands of dollars from victims.

Rev. August 2018

In order to conceal the crime, co-conspirators identified residential locations across the country where the cash should be sent, including but not limited to addresses in Maryland, Delaware, Pennsylvania, and Florida. These identified residential locations would either be vacant or for sale, so no one would be at those locations at the time of the deliveries. The Government contends that ULYSSE directed these activities.

ULYSSE recruited people to assist in retrieving the packages of cash when they were delivered to the specified residential locations. Co-conspirators opened the packages, counted the cash inside, and sent ULYSSE video recordings of the packages being opened and counted. Co-conspirators delivered the fraud proceeds to ULYSSE and to other people involved in the scheme. The Government contends that ULYSSE directed these activities.

The Government contends that ULYSSE distributed and directed other co-conspirators to distribute cash payments to other members of the conspiracy for their participation in the scheme.

On or about January 8, 2019, a member of the conspiracy contacted J.N., then 79 years old from La Quinta, California, by phone claiming he was an attorney for J.N.'s granddaughter. The caller stated that J.N's granddaughter had bene arrested and J.N. needed to send bail money to an address in Baltimore, Maryland. The caller told J.N. he could not tell anyone because the judge had imposed a gag order. J.N. sent a package containing $9,400 cash via FedEx to the Baltimore address as instructed.

Also, on or about January 8, 2019, a member of the conspiracy contacted by R.H., the 89 years old from Bainbridge Island, Washington, by phone and told him his grandson was in jail and R.H. needed to send bail money to an address in Baltimore, Maryland. The caller told R.H. that once his grandson appeared in court the bail money would be returned. R.H sent a package containing $9,000 cash via UPS to the Baltimore address as instructed.

On the morning of January 9, 2019, the packages of cash sent to by J.N. and R.H. to Baltimore, Maryland, were delivered by FedEx and UPS, respectively. ULYSSE utilized his Lyft ride-share account to provide transportation for retrieval of the packages between the two addresses.

On January 8, 2019, F.W., then 87 years old from Groton, Connecticut, received a phone call from a person who falsely claimed to be his grandson. While on the phone, the caller claiming to be his grandson passed the phone to another individual who falsely claimed to be a narcotics police officer. F.W. was told by the purported police officer to $9,000 cash by FedEx to another address in Baltimore so that his grandson could be released. F.W. sent a package containing $9,000 in cash via FedEx to that address. On January 9, 2019, the purported police officer again called F.W. and falsely claimed that there was a fine for the incident involving his grandson. F.W. was then instructed by the purported police officer to send an additional $9,400 to the same address, which F.W. did. On January 11, 2019, the purported police officer again called F.W. and falsely claimed that in the incident involving F.W.'s grandson, there was an


additional charge for obstruction of justice. F.W. was again instructed by the purported police officer to send an additional $9,800 to the same address, which F.W. did.

On January 12, 2019, the package of cash sent by F.W. was delivered to Baltimore, Maryland, via UPS. ULYSSE utilized his Lyft ride-share account to provide transportation to the address for retrieval of the package.

In March 2019, a member of the conspiracy contacted R.S., an 83 year-old woman from Saint Charles, Illinois by phone claiming to be R.S.'s grandson and told R.S that he had been in an accident as was in jail. The caller stated that R.S. needed to send money to an address in Lancaster, Pennsylvania to pay for purported damages. R.S. sent a package containing $20,000 cash to the Lancaster address as instructed.

On or about March 19, 2019, ULYSSE directed another member of the conspiracy to retrieve the package sent to Lancaster, Pennsylvania by R.S. ULYSSE directed the co-conspirator to videotape himself opening the package of cash and then send the video to ULYSSE so that ULYSSE could view the amount of cash in the package.

As a result of the execution of the elder fraud scheme between January 2018 and August 2019, ULYSSE and others caused at least 83 different victims to be directed to send a total of at least $2,420, 280. Of that amount, $1,834,545 was not returned to the victims. ULYSSE's conduct resulted in substantial financial hardship to at least five of the victims.

<u>The Unemployment Insurance Benefit Fraud Scheme</u>

On March 13, 2020, the President of the United States declared a national emergency concerning the outbreak of the novel coronavirus disease COVID-19. The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted on March 27, 2020. Among other things, the CARES Act established the Federal Pandemic Unemployment Compensation ("FPUC") and Pandemic Unemployment Assistance ("PUA") programs. Through the FPUC program, the federal government provided funds to state workforce agencies responsible for administration of state unemployment insurance systems and the disbursement of unemployment compensation to applicants entitled to benefits. FPUC funds were provided to supplement regular unemployment compensation payments to qualified applicants for unemployment benefits. Under PUA, states were permitted to provide PUA to individuals who were self-employed, seeking part-time employment, or otherwise would not qualify for regular UI compensation.

From at least in or about April 2020 through at least in or about November 2020, in the District of Maryland and elsewhere, ULYSSE conspired with others known and unknown to devise and execute a scheme to obtain unemployment benefits and other property by fraudulent pretenses and representations. In order to execute the fraud scheme, ULYSSE and his co-conspirators knowingly and willfully caused writings, signals, pictures, and sounds to be transmitted by interstate wire.

Specifically, ULYSSE and his co-conspirators obtained and attempted to obtain money, merchandise, and other property by submitting false applications in the names of identity theft

victims claiming unemployment benefits to which ULYSSE and other members of the conspiracy were not entitled. ULYSSE and his co-conspirators submitted these fraudulent claims for unemployment benefits through the Internet to the Maryland Department of Labor ("MD DOL"), the California Employment Development Department (CA EDD), and other state workforce agencies. These fraudulent applications listed individual victims' names, social security numbers, and dates of birth. MD DOL and other state workforce agencies disbursed benefits through debit cards issued in the names of applicants and mailed to addresses provided in the applications. By completing and submitting false applications for benefits in the names of identity theft victims, ULYSSE and his co-conspirators caused the issuance of debit cards in the victims' names and the mailing of those cards to locations in Maryland and elsewhere, which were accessible to the ULYSSE and other members of the conspiracy.

As a result of the fraudulent applications, MD DOL and other state workforce agencies approved disbursement of unemployment compensation funds that included federal funds provided through the FPUC and PUA programs. ULYSSE and his co-conspirators obtained from locations in Maryland and elsewhere debit cards issued as a result of their fraudulent claims and used the debit cards to withdraw money and to conduct retail transactions in Maryland and elsewhere.

Between July 20, 2020, and November 11, 2020, ULYSSE conducted fraudulent transactions through use of debit cards issued in the names of at least six identity theft victims and funded with unemployment compensation, including FPUC and PUA funds. Each debit card displayed a victim's name. The unemployment benefits were disbursed by MD DOL and other state workforce agencies as a result of fraudulent claims made in the victims' names by ULYSSE and other members of the conspiracy. ULYSSE was aware that real persons' identities were used to file the fraudulent unemployment claims and that the debit cards were issued in the names of real persons.

Specifically, on August 16, 2020, ULYSSE used a debit card issued in the name of R.P. to withdraw $440 from an ATM in Baltimore, Maryland. The debit card was issued in response to a fraudulent application for unemployment compensation submitted to MD DOL in R.P.'s name

On August 26, 2020, ULYSSE used a debit card issued in the name of R.B. to withdraw $500 from an ATM in Hempstead, New York. The debit card was issued in response to a fraudulent application for unemployment compensation submitted to MD DOL in R.B.'s name.

On September 26, 2020, ULYSSE used a debit card issued in the name of A.C. to withdraw $980 from an ATM in Baltimore, Maryland. The debit card was issued in response to a fraudulent application for unemployment compensation submitted to the CA EDD in A.C.'s name.

On November 30, 2020, ULYSSE was the driver of a vehicle that was stopped in Valdosta, Georgia by Lowndes County Sheriffs' Department. ("LCSO"). LCSO conducted a search of the vehicle and recovered debit cards in the names of R.B, R.P, and A.C. along with over 25 other debit cards in names other than ULYSSE's as well as multiple electronic devices.

As a result of the execution of the unemployment insurance benefit scheme between April 2020 and November 2020, ULYSSE and others submitted at least 143 fraudulent applications in the names of various identify theft victims, resulting in the funding of at least $618,767 in fraudulent unemployment benefits.  Losses in this amount were reasonably foreseeable to the ULYSSE.

SO STIPULATED:

_____
Sean R. Delaney
Christine Goo
Zachary Ray
Assistant United States Attorneys


_____
Medard Ulysse
Defendant

_____
Richard B. Bardos, Esq.
Counsel for Defendant